# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4542 | **DATE** | 9/30/2002 |
| **CASE TITLE** | Eddie Crockett vs. City of Northlake, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/15/2002 at 9:00 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER.  Defendants' motion for summary judgment (doc. # 27) is GRANTED as to Counts I, III and IV, and as to the City of Northlake and Officer Lopez on Count II.  The motion is DENIED as to the excessive force claim alleged in Count II against Officer Filskov in his individual capacity.  The matter is set for a status conference  on 10/15/02 at 9:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | OCT 0 1 2002 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | docketing deputy initials |
| | Mail AO 450 form. | | 9/30/2002 |
| | Copy to judge/magistrate judge. | | date mailed notice |
| JJK | courtroom deputy's initials | U.S. DISTRICT COURT CLERK  02 SEP 30 PM 3: 33  Date/time received in central Clerk's Office | JJK77  mailing deputy initials |

Document Number

34

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE D. CROCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | **DOCKETED** |
| | ) | |
| vs. | ) | No. 00 C 4542  OCT 0 1 2002 |
| | ) | |
| CITY OF NORTHLAKE, ILLINOIS and | ) | Magistrate Judge Schenkier |
| NORTHLAKE POLICE OFFICERS | ) | |
| EARL FILSKOV, STAR # 124, and LOPEZ, | ) | |
| STAR # 127, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On July 2, 2000, plaintiff, Eddie Crockett, filed a four-count complaint in this case against the defendants, City of Northlake, Illinois, and Northlake Police Officers Filskov and Lopez. Count I alleges that plaintiff was falsely arrested, falsely charged and maliciously prosecuted by defendants without probable cause, without a search warrant, and without an arrest warrant in violation of 42 U.S.C. § 1983 (Compl. ¶¶ 34-39). Count II, also pled as a Section 1983 claim, alleges that defendants used excessive force against the plaintiff during the arrest and subsequent incarceration (Compl. ¶¶ 40-45). Count III asserts a common law claim for malicious prosecution (Compl. ¶¶ 46-51), and Count IV alleges a cause of action for common law battery (Compl. ¶¶ 52- 57).

The defendants seek summary judgment on all claims alleged in the complaint (doc. # 27). For the reasons explained below, the Court grants summary judgment to all defendants on Counts

34

I, III, and IV; grants summary judgment as to the City of Northlake and Officer Lopez on Count II; but denies summary judgment to Officer Filskov with respect to Count II.[1]

## I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to local

---

[1]Pursuant to the consent of the parties under 28 U.S.C. § 636(c), on December 7, 2000, this case was transferred to this Court for all proceedings, including the entry of final judgment (doc. # 12).

Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.,* affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia,* 216 F.3d at 598.

## II.

Because the material facts are best understood in chronological order, we have organized the disputed and undisputed facts into three parts. Unless specifically identified as disputed, the facts set forth in Section II are undisputed. In Part A, we set forth the circumstances leading to Mr. Crockett's encounter with the defendants on August 22, 1998. In Part B, we recount the facts concerning Mr. Crockett's arrest that evening, and the wound he suffered when his handcuffs were removed. In Part C, we discuss both the facts related to the events taking place after Mr. Crockett received this wound.

## A.

As of August 1998, Mr. Crockett was a resident of the City of Chicago, living at his parent's house (Defendants' Rule 56.1 Statement of Undisputed Facts ("DSOF") ¶ 3). Mr. Crockett was working as a truant officer at West Leyden High School, having returned to Chicago after serving in the Marine Corps (DSOF ¶ 8). In August 1998, plaintiff's girlfriend, Maria Lopes, resided in an apartment building located at 136 S. Wolf Road in Northlake, Illinois (DSOF ¶ 9). Although his

official residence was at 5965 W. Erie, Mr. Crockett stayed overnight with Ms. Lopes at her apartment at least two to three times each week (DSOF ¶ 10).

Officer Filskov has been employed as a police officer by the Northlake police department since January 1990 (DSOF ¶ 11). Prior to August 22, 1998, Mr. Crockett was familiar with Officer Filskov, because Officer Filskov would respond to calls from West Leyden High School when there were reports of scuffles between students, or on occasions where someone had to be arrested (DSOF ¶ 12). Mr. Crockett also had encountered Officer Filskov once in 1997, when Officer Filskov responded to a disturbance at the King Arthur's Court neighborhood in Northlake, Illinois (*Id.*). According to Mr. Crockett, he had a verbal altercation between Officer Filskov at that time and Officer Filskov frisked him, but did not arrest him (Pl.'s Rule 56.1 Statement of Add'l Facts ("PAF") ¶ 1).

Officer Lopez has been a police officer with the Northlake police department since July 21, 1991 (DSOF ¶ 14). Prior to August 1998, Officer Lopez was familiar with Mr. Crockett, because he also responded to calls at West Leyden High School. On those occasions, Officer Lopez and Mr. Crockett discussed problems with the students (DSOF ¶ 15).

Prior to August 1998, Officer Filskov had participated in surveillance activities of the apartment building at 136 S. Wolf Road, after the Northlake police had received civilian complaints that drug dealing might be taking place at the building and that members of the Gangster Disciples frequented the building and resided there (DSOF ¶¶ 13, 17). During surveillance of the building, Officer Filskov observed certain vehicles parked at the building or nearby. One of these vehicles, a grey Buick Cutlass, was parked there overnight on numerous occasions. As part of the

investigation, Officer Filskov ran the license plate numbers for this vehicle, and others, to determine the owners. The grey Buick Cutlass was registered to Mr. Crockett (DSOF ¶ 18).

Sometime prior to August 22, 1998, the Northlake police department received information from an informant that crack cocaine was being sold in the alley behind the building at 136 S. Wolf Road (DSOF ¶ 19). In August 1998, the Northlake police department organized a joint undercover operation with the State of Illinois police department to purchase narcotics in the alley near the building at 136 S. Wolf Road and to make arrests (DSOF ¶ 20). The Northlake police department contacted an Illinois State Police gang unit working out of an office at 8330 South Martin Luther King Drive in Chicago (DSOF ¶ 21). The Illinois State Police gang unit was known as the "83rd and King" division (DSOF ¶ 21). Sgt. Robert Fierstein, who was a member of the 83rd and King Division, was contacted by the Northlake police department to assist a Northlake police officer in an undercover purchase (DSOF ¶ 22). Prior to August 1998, Sgt. Fierstein had participated in approximately 50 undercover operations to purchase narcotics (DSOF ¶ 23).

On August 22, 1998, Sgt. Fierstein and other officers from the 83rd and King Division arrived at the Northlake police department to discuss the operation (DSOF ¶ 23). According to the plan, Sgt. Fierstein would accompany Officer Tucker of the Northlake police department and attempt to purchase narcotics in an alley along side the building at 136 S. Wolf Road (*Id.*).

Pursuant to this plan, on the night of August 22, 1998, Sgt. Fierstein and Northlake Police Officer Tucker took a taxi to the 136 S. Wolf Road building (DSOF ¶¶ 23-24). The taxi driver was cooperating with the Northlake police department and knew about the operation. The undercover officers sat in the back seat of the taxi as it drove into the alley for the first time (*Id.*). On their first trip to the alley, they observed a female who told them that no drugs were available and to come back

in an hour (*Id.*). The officers did as they were told (*id.*) and, on their second trip, they observed a black male in the alley who was selling $20 rocks of crack cocaine (*Id.* ¶ 25). The officers saw that individual produce a clear plastic bag containing other, smaller bags (*Id.*). Money was exchanged for the bags and the officers left the alley (*Id.*).

When Sgt. Fierstein left the alley, he radioed the other state police officers providing them with the details of the purchase and a description of the seller. He performed a field test on the substances in the clear plastic bags, which tested positive for cocaine (DSOF ¶ 25). The undercover officers then returned to the Northlake police station (*Id.* ¶ 25). After receiving news from Sgt. Fierstein that the substance in the bags tested positive for the presence of cocaine, Northlake police officers and members of the 83rd and King division drove to 136 S. Wolf Road in a van (*Id.* ¶ 26). Sgt. Fierstein provided the officers with a description of the seller, and told them about the female he had encountered on the first attempt to make a purchase (*Id.* ¶ 26). Officers Filskov and Lopez, who were among the officers participating in the joint operation, received the description of the seller and the female (*Id.* ¶ 28).

As a result, Officers Filskov, and Lopez went to the apartment building at 136 S. Wolf Road; they were accompanied by other members of the 83rd and King division, including Breton O'Neill (DSOF ¶¶ 27, 30). The apartment building at 136 S. Wolf Road had three floors (DSOF ¶ 31). The officers smelled cannabis as they made their way into the building (*Id.* ¶ 32). The officers knocked on the first floor apartment door (*Id.* ¶ 33). When one of the residents of that apartment opened the door (*id.* ¶ 34), the officers smelled cannabis and observed smoke inside the apartment (*Id.* ¶ 35). The officers found approximately 15 people inside the apartment; approximately seven of these people had been smoking marijuana there (*Id.* ¶ 36). The officers also observed plastic bags

6

containing green, leafy substances in plain sight (DSOF ¶ 37), and several "blunts" (the size of cigarettes or cigars) filled with cannabis – some of which were lit (*Id.* ¶ 37).

Mr. Crockett was one of the individuals inside the first floor apartment at 136 S. Wolf Road when the Northlake and Illinois State police officers arrived (DSOF ¶ 38). Officers Filskov, Lopez and members of the state police patted down the subjects and secured the area (*Id.* ¶ 39). Mr. Crockett was taken outside of the building by Officer Lopez (*Id.* ¶ 40).

### B.

It is here that the parties begin to dispute what occurred. The defendants assert that the Officers Filskov and Lopez started a "conversation" with Mr. Crockett (DSOF ¶ 40), who denies that any conversation took place (Plaintiff's Response to Defendant's Rule 56.1(a) Statement of Undisputed Facts ("RSF") ¶ 40). Instead, Mr. Crockett asserts that Officer Filskov had a gun drawn and made statements to him such as "say good-bye to your nice job, Mr. Crockett" (RSF ¶ 40). The defendants also assert that Mr. Crockett told them that there were drugs in the upstairs apartment where he and his girlfriend resided, gave the officers consent to search the apartment by signing a consent form, and then gave the defendant officers the keys to Ms. Lopes's apartment, which were in Mr. Crockett's pocket (DSOF ¶¶ 40-41). Mr. Crockett's memory of these events is somewhat different. Mr. Crockett claims that he never gave the keys to the officers, but that they took the keys out of his pocket (RSF ¶ 41). Mr. Crockett does admit that he read and signed the consent form, which asked for his permission to search an apartment in the building – but he denies he gave consent to search Ms. Lopes's apartment (DSF ¶ 42; RSF ¶ 42).

The defendants' version of the entry and search of the unmarked apartment is also disputed by the plaintiff. Defendants assert that Mr. Crockett showed them which apartment to enter and

which key opened the door (Defs.' Ex. 8, at 9; Pl.'s Ex. 1, at 54). The defendants also claim that Officers Lopez, Filskov and O'Neill accompanied Mr. Crockett inside the apartment, and that Mr. Crockett led them to the kitchen area and directed their attention to an orange pumpkin on the kitchen table, inside which they discovered plastic bags containing green, leafy substances that the Officers believed were cannabis (DSOF ¶ 44). Consequently, the plastic bags containing green, leafy substances were removed from the orange pumpkin by the Northlake police officers and collected as evidence (*Id.* ¶ 45).

Mr. Crockett denies many of these assertions (RSF ¶¶ 44-46; Pl.'s Ex. 1, at 54). However, it is undisputed that the keys the officers obtained from plaintiff's pocket opened a locked door to one of the unmarked, unnumbered apartments on the second floor of 136 S. Wolf Road (DSOF ¶ 41). It is also undisputed that the officers entered and searched this apartment, and found a green, leafy substance that later was examined by Dr. Lee K. Chu, a forensic scientist for the Illinois State Police, Division of Forensic Scientists, on August 26, 1998 (*Id.* ¶¶ 43-44; 48). Dr. Chu determined that the green, leafy substance tested positive for cannabis (*Id.* ¶ 48).[2]

---

[2]The exact apartment number identified in the consent form is an open question, because neither party has submitted a copy of the consent form. Moreover, although we were given the transcript of a suppression hearing conducted in the state court criminal matter and arising out of the events of August 22, 1998, the parties did not give us any documentation confirming the state court's ruling or the basis for it (although both parties agree that the evidence seized from 136 S. Wolf Road was suppressed in the criminal case against Mr. Crockett). From this transcript, we have gleaned the following information.

At the state court suppression hearing, Mr. Crockett's attorney argued that Maria Lopes, plaintiff's girlfriend, lived in Apartment 3 West, not 3 East (Defs.' Ex. 2, Suppression Hearing Transcript, page 18). The parties also apparently agreed, at that time, that the consent to search form signed by Mr. Crockett identified Apartment 3 East, not 3 West. Because the drugs were found in 3 West – not 3 East – the state court judge well may have suppressed the drug evidence found in 3 West because Mr. Crockett never signed a consent form to search 3 West (even though the keys obtained from his pocket opened that door) (*Id.*).

However, in opposing summary judgment in this case, Mr. Crockett has shifted course: contrary to what he argued at the state court suppression hearing, Mr. Crockett now asserts that he and Maria lived in Apartment 3 East, not 3 West (*compare* RSF ¶ 42 *with* Pl.'s Add'l Facts ¶¶ 72-74). At the time of the suppression hearing, Mr. Crockett's litigation interest was served by asserting that he lived in Apartment 3 West. If the consent form he signed indicated

8

The parties agree that Mr. Crockett was arrested on August 22, 1998 and taken to the Northlake police department (DSOF ¶ 46). The parties also agree that, pursuant to the arrest, Mr. Crockett was handcuffed using plastic ties called flex-cuffs that work like a strong garbage bag tie (*Id.* ¶ 47). Flex-cuffs are used in situations involving mass arrests, where the number of persons arrested outnumber the available amount of standard issue handcuffs (*Id.*). In August 1998, the Northlake police department did not issue its officers special tools to remove flex-cuffs (*Id.* ¶ 47). Likewise, as of that time, Illinois state police officers were not issued special tools to remove the flex-cuffs (*Id.* ¶ 47).

Because Officer Filskov did not have a special tool to remove plaintiff's flex-cuffs, he decided to use a knife, which is the only way to remove flex-cuffs – and which was the way that

---

consent to search Apartment 3 East and if the police searched Apartment 3 West, then they did not have plaintiff's consent to do so; and, without a warrant, the evidence would be suppressed and the charges dismissed for lack of evidence. But now, on summary judgment, where the issue is probable cause to arrest and not the validity of the search, Mr. Crockett is best served by asserting that he and Maria lived in Apartment 3 East. If they lived in Apartment 3 East, then the basis for probable cause to arrest would be undermined, because the police searched and found drugs in Apartment 3 West.

Plaintiff cannot have it both ways. In fact, the doctrine of judicial estoppel may be applicable here to hold plaintiff to his initial assertion in state court. Judicial estoppel is to be applied where "intentional self-contradiction is being used as a means of gaining unfair advantage . . . ." *Medcom Holding Co. v. Baxter Travenol Labs. Inc.*, 106 F.3d 1388, 1396 (7th Cir. 1997). Moreover, judicial estoppel "prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued earlier by that party in a legal proceeding." *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 789-90 (7th Cir. 1999). Thus, the party sought to be estopped must have obtained a favorable result in the earlier litigation on the basis of a contention that the party is repudiating in the current litigation. *See McNamara v. City of Chicago*, 138 F.3d 1219, 1225 (7th Cir. 1998).

We have some pause about applying judicial estoppel here, because we do not have the consent form and because no one has presented decisive evidence of the basis for the state court's suppression order. However, any arguable dispute about which apartment Ms. Lopes and Mr. Crockett lived in, or which apartment was denominated in the consent form, does not defeat summary judgment. As discussed *infra*, other undisputed facts – including the fact that the keys unlocking the apartment where drugs were found were undisputably found in plaintiff's pocket (regardless of whether he gave those keys to the defendants or whether they took the keys from him) – gave the police officers with sufficient basis for probable cause to arrest the plaintiff once the green, leafy substance was found.

Officer O'Neill of the Illinois state police also removed flex cuffs (DSOF ¶ 50).[3]  It is agreed that to remove the flex-cuffs with the knife, Officer Filskov told plaintiff to face the wall, and that Mr. Crockett complied (DSOF ¶¶ 47, 50-51).

The parties dispute the remainder of what happened thereafter.  The defendants contend that Officer Filskov inserted the knife blade under the flex-cuffs and began lifting upward (DSOF ¶ 53).  The defendants claim that, as Officer Filskov did so, Mr. Crockett flinched, causing the tip of the blade to scratch Mr. Crockett's lower back (*Id.*).  According to Mr. Crockett, he suffered far more than a "scratch" – he asserts that Officer Filskov dug the knife into his back and then cut him to make a "slice" (RSF ¶¶ 52, 54).

## C.

The following facts recount what took place after Mr. Crockett received this knife wound. The parties agree that after the knife "scratched" or "cut" Mr. Crockett's back, Officer Filskov instructed another Northlake police officer to call an ambulance (DSOF ¶ 54).  He placed Mr. Crockett in a holding cell to await the arrival of the paramedics (*id.* ¶ 55) and, in the meantime, went in search of a first aid kit (*Id.* ¶ 54).  The parties further agree that Officer O'Neill, who was standing nearby, overheard other arrestees from 136 S. Wolf Road, who were at the police station and saw what had occurred, saying "Lawsuit" and "Fuck the police" (*Id.* ¶ 56).  Officer O'Neill also heard Mr. Crockett say, at that time, that he was "paralyzed" and "couldn't walk" and would not allow any officers to look at the wound because "it was too painful" (*Id.*).  She further overheard Mr. Crockett saying that he was going to sue the police (*Id.*).

---

[3] While the parties disagree about whether Officer Filskov used a field knife, as plaintiff contends (RSF ¶ 50), or a utility knife, as Officer Filskov contends (DSOF ¶ 50), we do not find this dispute to be material.

The parties agree that the paramedics ultimately arrived at the station in response to a phone call regarding Mr. Crockett's wound (DSOF ¶ 57), but dispute what happened after the paramedics arrived. The defendants state that Mr. Crockett was belligerent and almost kicked one of the paramedics in the face (*Id.*); Mr. Crockett claims that when the paramedics arrived, Officer Filskov wanted Mr. Crockett to walk out of the police station by himself, rather than be carried out by the paramedics (RSF ¶ 57). Mr. Crockett says that he told the paramedics and Officer Filskov that he could not walk, at which point four officers "grabbed" him like he "was in a chair upside down" with his belly touching the ground until they got him to start walking out with their help (*Id.* ¶ 57). Then, according to Mr. Crockett, his head started hitting the ground as he was going down some stairs. Mr. Crockett also testified that someone told him to get ready to have his picture taken; someone tossed him onto a stretcher; and Officer Filskov grabbed him by the neck and pulled it up saying "smile for the picture" (*Id.*).

The paramedics took Mr. Crockett to Gottlieb Memorial Hospital, a ten minute ride from the Northlake police department (DSOF ¶ 58). Michael Casanave, the Chief Paramedic, together with Scott Thayer, were the paramedics who responded to the call regarding Mr. Crockett (*Id.* ¶ 62). Mr. Casanave treated plaintiff at the jail and filled out a standard EMS run sheet there, completing it at the hospital (*Id.* ¶ 63). Mr. Casanave remembered that the laceration sustained by Mr. Crockett had stopped bleeding on its own prior to his arrival, as noted on the EMS run sheet, and that Mr. Crockett did not complain of any other injuries (DSOF ¶ 63). While the parties dispute whether the injury sustained by Mr. Crockett was "minor" (RSF ¶ 63), it is undisputed that in the EMS run sheet he completed, Mr. Casanave characterized the cut as a "minor" wound (DSOF ¶ 63).

The parties further agree that, upon Mr. Crockett's arrival at Gottlieb Hospital, he was examined by Dr. Jeff Parmozo (DSOF ¶ 64). It is undisputed that Dr. Parmozo examined Mr. Crockett and authored a report (Defs.' Ex. 10), which states: "The patient is a prisoner and was cuffed with plastic cuffs. When an officer approached to cut them off he cut the patient in the back region (his hands were behind him)." The report also states that plaintiff's wound was a "superficial linear 5 cm incision [a little more than 2-inch] type laceration" (Id.). In his report, Dr. Parmozo further observed that the "level of pain [experienced by Mr. Crockett] seems not to be consistent with the laceration and the lack of other soft tissue visible trauma except for the superficial incision-like laceration" (DSOF ¶ 64).

The parties further agree that plaintiff was terminated from his job after the Northlake Chief of Police sent the Dean of Students at West Leyden High School a letter indicating that Mr. Crockett had been arrested and charged in a drug offense; this letter advised the Dean to restrict Mr. Crockett's contact with the student body (Pl.'s Ex. 3). The plaintiff claims that this letter resulted in his termination (Compl. ¶ 31).

### III.

We turn now to Mr. Crockett's four claims for relief. In Count I, Mr. Crockett alleges a Section 1983 claim against the City of Northlake and against the defendant officers for false arrest, false charges, and malicious prosecution (Compl. ¶ 36). In Count II, Mr. Crockett alleges a Section 1983 claim against the same defendants on the theory that the defendants used excessive force when arresting and incarcerating him (Compl. ¶ 42). In Count III, Mr. Crockett alleges a claim against these same defendants for malicious prosecution under Illinois law, based on the theory that "[d]efendants owed a duty to [him] not to falsely charge him with a crime where there was no

probable cause to believe a crime was being committed" (Compl. ¶ 49). In Count IV, Mr. Crockett alleges a claim against these same defendants for battery under Illinois law, based on the theory that the defendants stabbed and dragged plaintiff without justification (Compl. ¶¶ 44-56). We address each claim in turn.

## A.

In Count I, Mr. Crockett asserts a Section 1983 claim for false arrest, false charges, and malicious prosecution, based on the theory that he was arrested and prosecuted "without a search or arrest warrant and without probable cause to believe he was committing a crime" (Compl. ¶ 36). In defending against this claim on summary judgment, Mr. Crockett relies on the "triparte formula" for proving such claims set forth in *Sneed v. Rybicki,* 146 F.3d 478 (7ᵗʰ Cir. 1998), and *Reed v. City of Chicago,* 77 F.3d 1049 (7ᵗʰ Cir. 1996) (Pl.'s Resp. at 6). However, in *Newsome v. McCabe,* 256 F.3d 747 (7ᵗʰ Cir. 2001), the Seventh Circuit treated those opinions as dicta on the question of Section 1983 claims for malicious prosecution – and, instead, squarely held that there is no such cause of action. *Id.* at 750-51. The Seventh Circuit recently has reaffirmed that ruling, holding that because there is no "constitutional right not to be prosecuted without probable cause," a plaintiff "may not state a § 1983 claim simply by alleging that he was maliciously prosecuted." *Penn v. Harris,* 296 F.3d 573, 576 (7ᵗʰ Cir. 2002) (citing *Newsome,* 256 F.3d at 750-51). Instead, a plaintiff "must allege the violation of one of his constitutional rights, such as the right to a fair trial." *Penn,* 296 F.3d at 576 (citing *Newsome,* 256 F.3d at 750-52). Mr. Crockett asserts no such violation. Therefore, his malicious prosecution claim pled under Section 1983 fails as a matter of law.

However, as a false arrest claim pled under the Fourth and Fourteenth Amendments, Mr. Crockett's claim in Count I warrants a closer examination of the record. To prove his false arrest

claim, Mr. Crockett must show that the defendant lacked probable cause for the arrest. *Baker v. MCollan,* 443 U.S. at 137, 142 (1979). "Probable cause exists when, based on the facts known, a reasonable person would believe a person was guilty of committing an offense." *Penn,* 296 F.3d at 576-77 (citing *Cervantes v. Jones,* 188 F.3d 805, 811 (7ᵗʰ Cir. 1999)). Thus, any facts or beliefs held by the plaintiff, not known to the police officers at the time of the arrest, are immaterial to the question of probable cause. Rather, the issue is "whether the officers' actions [in arresting the plaintiff were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. M.S. Connor,* 490 U.S. 386, 397 (1989). "When the facts known are undisputed, probable cause is a question of law." *Penn,* 296 F.3d at 577.

Mr. Crockett argues that material fact disputes here preclude a determination of probable cause as a matter of law (Pl.'s Resp. at 7). However, after careful review of the record, the Court finds that there are sufficient undisputed, material facts concerning what was known to the defendant police officers at the time of the arrest to establish probable cause for the arrest. Consequently, we treat the question of probable cause here as a question of law.

It is undisputed that the defendant officers had information about possible drug dealing at 136 S. Wolf Road; that prior to the August 22, 1998 arrest, defendant Officer Filskov conducted surveillance on the apartment building; and that during surveillance, police identified a grey Buick Cutlass registered to Mr. Crockett parked overnight and outside the building at 136 S. Wolf Road. Also, the Northlake police department received information about crack cocaine being sold in the alley behind the apartment at 136 S. Wolf Road, and participated in a controlled purchase on the evening of August 22, 1998. Based on that information, the defendant officers entered into an

14

apartment in the building at 136 S. Wolf Road and discovered a party where the plaintiff and bags of cannabis were found.

Although the parties' versions of events occurring after plaintiff was pulled out of the party by the defendant officers diverge and are largely disputed, it is undisputed that the keys in plaintiff's pocket opened the door to one of the apartments upstairs in the 136 S. Wolf Road building, and that inside the apartment the defendant officers found a green, leafy substance that they believed to be (and that later was confirmed to be) cannabis. Based on the information that caused the 136 S. Wolf Road building to come under investigation, the controlled purchase, the presence of plaintiff in a party where the officers observed the presence and use of cannabis, and the presence of keys in plaintiffs' pocket that opened a door to an apartment containing more cannabis, the Court finds that the defendant officers had a reasonable basis for believing that plaintiff was committing a crime and therefore probable cause to arrest him based on this belief.

We so hold, mindful that plaintiff did not have any drugs on his person at the time of the arrest. And, we recognize that the facts regarding whether plaintiff consented to the search of the apartment in question are somewhat murky. However, questions related to whether the plaintiff had authority to consent to a search of the apartment in question, or actually consented to the search of that apartment, go to the issue of whether a search of the apartment and seizure of the drug evidence was proper. It does not go to the question of whether the arrest of plaintiff was based on probable cause. Moreover, to the extent that Mr. Crockett claims he did not have control over the apartment that was searched (and where drugs were found), that, too, is a point that would go to whether a prosecution ultimately would be successful – but not to whether there was probable cause for an arrest or charges to be brought. *See United States v. Carrillo,* 269 F.3d 761, 766 (7th Cir. 2001)

(probable cause is a lesser standard than reasonable doubt, or even preponderance of the evidence). On that question, we find that probable cause existed in this case, based on the undisputed facts, as a matter of law.

The existence of probable cause is fatal to Mr. Crockett's false arrest claim. "The Fourth Amendment is not violated by an arrest based on probable cause" even though there is "mistaken execution of a valid search warrant on the wrong premises." *Graham,* 490 U.S. at 396 (citing *Maryland v. Garrison,* 480 U.S. 79 (1987)). Thus, if probable cause exists at the time of an arrest, then the police cannot be held liable for the ensuing custody, even if facts later show that the police were mistaken. *Baker v. McCollan,* 443 U.S. 137, 145 (1979). Accordingly, summary judgment is granted on that claim in favor of the defendant officers and the City of Northlake.

Finally, Mr. Crockett asserts that the City of Northlake Chief of Police violated plaintiff's constitutional rights by informing his employer of the arrest and the charges brought against him and used his "final decision making authority" to seek plaintiff's termination from his job (Pl.'s Resp. at 8; *see also* Pl.'s Ex. 3). However, although asserted in his summary judgment papers, this theory of municipal liability has not been pled as a cause of action in Count I, and is therefore waived. *See Whitaker v. T.J. Snow Co.,* 151 F.3d 661, 664 (7th Cir. 1998). Even if not waived, any theory of municipal liability for that conduct lacks sufficient evidence to support a claim for relief under *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978).

Although Mr. Crockett alleges that the Northlake Police Chief acquiesced in a "continuation of false charges against plaintiff" (Compl. ¶ 33), the mere fact that the Police Chief sent a single letter to plaintiff's employer "strongly urg[ing]" the Dean of Students to "take action" against plaintiff "in an attempt to restrict his contact with the student body" – a letter based solely on the

16

arrest and charges – is not sufficient evidence of a "policy" or "practice" sufficient to establish municipal liability under *Monell* or its progeny. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985). There is no such proof in this case. Accordingly, the Court grants the defendants' motion for summary judgment on Count I.

### B.

In Count II, the plaintiff alleges that his civil rights were violated because the defendant officers used excessive force against him after his arrest and while he was incarcerated without probable cause. Claims of excessive force arising in the pretrial detainee context are analyzed under the Fourth Amendment reasonableness standard. *Graham v. O'Connor,* 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "[T]he question is whether the officers' actions are 'objectively reasonable' in the light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The Court finds that the issue of probable cause in Count II can be decided as a matter of law as to the City and Officer Lopez, but not as to Officer Filskov.

### 1.

Officer Lopez, although named as an agent involved in the excessive force allegations of Count II, cannot be held liable for such allegations, even if the allegations are proven true. No fact, disputed or otherwise, implicates him directly or indirectly in the alleged stabbing. Nor has plaintiff

offered evidence that Officer Lopez was one of the four officers who allegedly dragged him after the paramedics arrived – while plaintiff asserts otherwise (*see* PAF ¶ 77), the evidentiary citation offered by plaintiff do not support that assertion.[4]   Moreover, Officer Lopez is not alleged to have any authority over Officer Filskov, such that he could be held liable for consent, acquiescence, permission or direction (as alleged in paragraph 41 of the complaint) in connection with that alleged conduct.   In short, Mr. Crockett has not offered any facts that could implicate defendant Officer Lopez in the allegations of Count II, and therefore summary judgment as to that count will be granted in favor of Officer Lopez in his official capacity.

## 2.

Mr. Crockett offers no evidence that would create a triable issue concerning the City's involvement in Officer Filskov's alleged actions against the plaintiff.   In other words, there are no facts to support the consent, acquiescence, permission or direction allegations in the complaint.   It is undisputed that the City of Northlake permits the use of flex cuffs that cannot be removed without being cut off, and that the City does not have a policy of issuing a standard tool to its officers for such removal.   But, Mr. Crockett offers no evidence that using flex cuffs or not issuing a standard tool for their removal raises constitutional issues.   Rather, what is at issue is Officer Filskov's conduct in removing them – and his alleged acts thereafter.   And, Mr. Crockett offers no evidence that the City has a policy, practice or custom of consenting to the use of a field knife in the manner in which the field knife was allegedly used in this case, or to the conduct that Mr. Crockett alleges occurred after the paramedics arrived.

---

[4]In his deposition testimony, the plaintiff alleges only that Officer Lopez told paramedics that the wound was minor and that plaintiff could walk out under his own power (PAF ¶ 77, Ex. 1 at 84-85). Mr. Crockett does not identify Officer Lopez as one of the four officers who then allegedly dragged him to the stretcher.

Without such evidence, the City cannot be held liable under a theory of municipal liability. Summary judgment will therefore be granted in favor of the City of Northlake on Count II.

**3.**

There are material disputes of fact that prevent summary judgment against defendant Officer Filskov in his official capacity. Officer Filskov argues that summary judgment should be granted in his favor because "[t]he decision to use a knife to remove the flex-cuffs around the plaintiff's wrist was an objectively reasonable use of force under the circumstances" (Defs.' Reply at 12). This argument misses the point of the Fourth Amendment inquiry by focusing on Officer Filskov's decision to use the knife, rather than on how Officer Filskov used the knife. The question is how the knife was used, not whether a knife could be used, and plaintiff's testimony accusing Officer Filskov of "stabbing him" and "digging" the blade into his back creates a triable question of material fact (RSF ¶¶ 52-57, 62-64, 67; Pl.'s Add'l Facts ("PAF") ¶ 76). It would not be objectively reasonable for Officer Filskov to purposefully stab plaintiff or dig the knife into his back to cut off the plastic cuffs – or, once seeing him injured, to engage in the alleged conduct of dragging Mr. Crockett on the floor so that his head hit concrete stairs.[5]

If a jury credits Officer Filskov's version of events (*i.e.,* that the cut was minor; that the cut was the result of an accident caused when the plaintiff flinched; and that he did not thereafter drag the plaintiff or cause him to strike his head), then there will be no finding of liability. But, if the jury

---

[5]Mr. Crockett's testimony does not identify by name Officer Filskov as one of the four officers who allegedly dragged him to the stretcher. However, Mr. Crockett does identify Officer Filskov as one of the officers who stated that Mr. Crockett could walk under his own power, and as the officer who – after Mr. Crockett was put onto the stretcher – grabbed his neck roughly and forced it upward, causing neck strain (PAF ¶ 77, Ex. 1 at 84-87). Giving the plaintiff the benefit of all reasonable and permissible inferences, and in light of the allegation that Officer Filskov inflicted the knife wound, we believe this evidence creates a triable issue here concerning whether Officer Filskov participated in the alleged dragging.

finds the plaintiff's testimony credible, then there may be a finding that Officer Filskov used unreasonable and excessive force in violation of the Fourth Amendment. The question for the jury will be to determine the credibility of the witnesses, a question the Court cannot decide on summary judgment. Therefore, defendants' motion for summary judgment on Count II is granted as to the City and Officer Lopez, but denied as to Officer Filskov (who is sued on this Count solely in his official capacity).

## C.

In Count III, the plaintiff alleges a state law malicious prosecution claim based on the theory that defendants lacked probable cause for the arrest (Compl. ¶ 47). To prove a claim for malicious prosecution under Illinois law, Mr. Crockett must show that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) defendants instituted the proceedings maliciously; (4) the proceedings were terminated in Mr. Crockett's favor; and (5) there was an injury. *Treece v. Village of Naperville,* 903 F. Supp. 1251, 1257 (N.D. Ill. 1995) (citing Illinois state court cases). The Court has found that the undisputed facts show that defendants had probable cause for the arrest, and we further conclude that those undisputed facts show probable cause for the prosecution. *See Penn,* 296 F.3d at 576-77 (observing that probable cause for the arrest would defeat a state law claim for malicious prosecution). Summary judgment is therefore granted with respect to Count III in defendants' favor.[6]

---

[6] In light of this disposition, we need not decide defendants' contention that this claim would be barred by the statute of limitations – although, based on our reading of Illinois law as explained below, we believe it would. We also need not decide whether the plaintiff has evidence to support the "injury" element (which requires proof of injury "beyond the cost of defending the suit") or the element of a termination in his favor (which requires proof that the "circumstances surrounding dismissal reflect innocence"). *Penn,* 296 F.3d at 576-77.

## D.

In Count IV, the plaintiff alleges a claim of common law battery, based on the assertion that the defendants "owed a duty to [p]laintiff not to stab or drag [p]laintiff without justification" (Compl. ¶ 55). The defendants argue that this claim is time-barred because it was not brought within the one-year statute of limitations period set forth under the Illinois Local Government Employees Tort Immunity Act (the "Tort Immunity Act" or the "TIA"), codified at 745 ILCS 10/8-101 (Defs.' Mem. at 5). Mr. Crockett disagrees, and argues that the governing limitations period is the two-year statute of limitations for personal injury, found at 735 ILCS 5/13-202 (Pl.'s Resp. at 6).

Mr. Crockett claims that the alleged battery took place on August 22, 1998. He then filed this lawsuit on July 26, 2000. Thus, there is no question that if the TIA statute of limitations applies here, Mr. Crockett's claim is time-barred; if the personal injury statute of limitations applies, it is not. For the reasons that follow, we conclude that the TIA statute of limitations applies here, and thus grant summary judgment for the defendants on the battery claim.

## 1.

The TIA provides that "[n]o civil action may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101. By its express terms, this statute of limitations applies to all local public entities *and* their employees. *Roark v. Macoupin Creek Drainage District*, 738 N.E.2d 574, 579 (Ill. App. Ct. 4th Dist. 2000). The purpose of this short limitations period "is to encourage early investigation into the claim asserted against the local government at a time when the matter is still fresh, witnesses are available, and conditions have not materially changed." *Saragusa v. City of Chicago*, 348 N.E.2d 176, 179 (Ill. S. Ct. 1976).

Plainly, Mr. Crockett's battery claim against the City and the defendant officers constitutes a claim against "a local entity or its employees for an injury" – as used in the TIA, the word "injury" refers both to accidental and tortious injury to a person or property, and thus applies to claims of intentional battery. *Panko v. Cook County*, 356 N.E.2d 859, 863 (Ill. App. Ct. 1st Dist. 1976). Thus, the one-year statute of limitations in Section 8-101 of the TIA would on its face appear to apply. However, the two-year statute of limitations in section 5/13-202, which applies to "[a]ctions for damages for an injury to the person," generally governs personal injury claims – including claims for battery. *See Goldstein v. Kinney Shoe Corp.*, 931 F. Supp. 595, 598 (N.D. Ill. 1996); *Prior v. U.S. Cellular Corp.*, 46 F. Supp. 2d 808, 811-12 (N.D. Ill. 1999). In a situation where both the TIA and another statute of limitations could apply, Illinois courts often have invoked the principle that "where there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one subject, the particular provision must prevail." *Hernon v. E.W. Corrigan Construction Co.*, 595 N.E.2d 561, 563 (Ill. S. Ct. 1992) (quoting *Bowes v. City of Chicago*, 120 N.E.2d 15, 31 (Ill. S. Ct. 1954)). In applying that principle, Illinois courts frequently have examined the nature of the plaintiff's action and the injury allegedly sustained. *Hernon*, 595 N.E.2d at 563.

However, in its most recent decision addressing this question in the specific context of the TIA, a majority of the justices of the Illinois Supreme Court concluded that the governing consideration is not the nature of the plaintiff's claim or injury, but rather the identity of the defendants being sued. In *Tosado v. Miller*, 720 N.E.2d 1075 (Ill. S. Ct. 1999), the Illinois Supreme Court considered whether a medical malpractice claim brought against local public entities and their employees would be governed by the one-year limitations period in Section 8-101 of the TIA or by

the two-year limitations period found in the Illinois Code of Civil Procedure governing damage claims "for injury or death against any physician, dentist, registered nurse or hospital. . .whether based upon tort, or breach of contract, or otherwise, arising out of patient care. . . ." 735 ILCS 5/13-212(a). In a 4-3 decision, the Illinois Supreme Court held the one-year statute of limitations of the TIA applicable.

Writing for the court, Justice Miller examined the purpose of the TIA, and found that the legislature had "focused on a particular category of potential defendants and granted local governmental entities and their employees greater protection than nongovernmental entities and their employees" 720 N.E.2d at 1080. Justice Miller concluded that as a result, in determining whether to apply the TIA statute of limitations, "the focus should be on the defendants rather than the cause of action or the type of injuries sustained by the plaintiffs." *Id.* Using that focus, Justice Miller concluded that Section 8-101 of the TIA, which covers claims only against local entities and their employees, was more specifically applicable than Section 13-212 of the Illinois Code of Civil Procedure, which applies more broadly to both private and public hospitals, and to physicians, dentists and registered nurses irrespective of whether they are employed by public entities. *Id.* at 1080-81.

While three justices joined Justice Miller's opinion, two did so with special written concurring opinions. In his concurring opinion, Justice Heiple found the emphasis on which statute of limitations was more specific to be an "oversimplification because section 8-101 is *both* more specific *and* more general than the statutes of limitations in section 13-212(a)": he reasoned that section 8-101 was more specific because it applies to a more narrow class of defendants than section 13-212(a), but more general in that it applies to civil actions other than those asserting medical

malpractice. 720 N.E.2d at 1082. But Justice Heiple agreed with Justice Miller's analysis in this critical respect: that "[b]y its very nature. . . , section 8-101 was designed to apply broadly to any possible claim against a local governmental entity and its employees." *Id.* at 1083. In Justice Heiple's view, "[t]his type of comprehensive protection necessarily controls over other statutes of limitations." *Id.* In his concurring opinion, then-Chief Justice Freeman specifically quoted and adopted Justice Heiple's analysis. *Id.* at 1082.

Thus, for Justice Miller (and Justice Kilbride, who joined the opinion without qualification), that factor led to the conclusion that the TIA was more specifically applicable to the case than the statute of limitations that generally governs medical malpractice suits. For Justice Heiple and then-Chief Justice Freeman, the fact that local entities and their employees were being sued as defendants was dispositive without regard to an analysis of the ways in which the two statute of limitations might be more general or more specific. But, either way, what emerges from the plurality and concurring opinions is that a majority of the justices in *Tosado* found the governing consideration in deciding whether to apply the TIA was the class of defendants being sued. And that is fatal to plaintiff's statute of limitations argument here: Mr. Crockett plainly is asserting a claim for injury (battery) against a local entity (the City of Northlake) and its employees (Officers Filskov and Lopez). The Court therefore concludes that under *Tosado*, the one-year statute of limitations in the TIA applies.[7]

---

[7]In reaching this conclusion, the Court has considered the view expressed by one Illinois appellate court that the *Tosado* opinion is limited to the particular competing statutes of limitations presented in that case, and in any event is "too severely splintered" to provide clear guidance as to the test to apply in determining when the TIA applies. *Roark*, 738 N.E.2d at 583. We disagree with both propositions. As to the latter point, while there were three opinions that explained the majority result, those three opinions all agreed on a pivotal point – that the key consideration in choosing between the TIA limitations period and some other statute of limitations is the class of defendants being sued. As to the former point, we do not read the plurality opinion as limiting the importance of that consideration to the particular competing statutes of limitations at issue in that case. To the contrary, in rejecting the plaintiff's request to

24

Indeed, the plaintiff concedes that his claims in Count IV are barred against the City, and against the defendant officers in their *official* capacities (Pl.'s Resp. at 6). However, plaintiff argues that he has asserted his battery claim against the officers in their *individual* capacities, as well; that the TIA "does not bar an action against them as individuals;" and that the two-year statute should govern the battery claim against the defendant officers in their individual capacities (Pl.'s Resp. at 6).

At the threshold, we must decide if Count IV in fact asserts individual capacity claims against the defendant officers. The complaint does not expressly state that the defendant officers are being sued individually. However, Count IV does seek punitive damages against the defendant officers, and under governing Seventh Circuit law, that is enough to indicate that the battery claim is being pressed against them in their individual capacities. In *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991), the Court of Appeals wrote:

> As injunctive relief against a state official may be recovered only in an official capacity suit, so may punitive damages be recovered against a government actor only in an individual capacity suit. . . . [And,] in a suit where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint.

Thus, we treat Mr. Crockett's battery claim as one seeking recovery against the defendant officers in their individual capacities.

---

apply its decision only prospectively, the plurality opinion explained that the *Tosado* decision "does not establish a new principle of law, for we believe that it was foreshadowed by the language of the statute, which, we have determined, requires this result." *Tosado*, 720 B.E.2d at 1081. This reasoning does not suggest that the four justices who comprised the majority in *Tosado* viewed their analysis as limited to the facts of that case.

However, that does not aid Mr. Crockett in avoiding the one-year statute of limitations. Under Illinois law, the TIA statute of limitations applies where a public employee is sued individually for acts that occur during the course of employment. *Racich v. Anderson*, 608 N.E.2d 972, 973 (Ill. App. Ct. 3rd Dist. 1993) (TIA statute of limitations applied to personal injury suit against a school bus driver in her individual capacity, where the accident giving rise to the injury occurred while she was transporting school children). Here, while Mr. Crockett may seek to recover damages against Officers Filskov and Lopez individually, the battery claim he asserts against them is based on their conduct while acting under color of law. All of the alleged acts of battery would have occurred while the defendants were acting in their role as police officers and performing their regular duties, such as handcuffing an arrestee, removing the cuffs, incarcerating the arrestee, and transporting the arrestee, once injured, out of the jail. This is further confirmed by plaintiff's allegation that he was stabbed and dragged down concrete steps by the defendant officers "either at the direction of or because of willful and wanton lack of supervision [by the City of Northlake] over its agents" (Compl. ¶ 53).

We also note that under plaintiff's theory, one statute of limitations would apply to the battery claim against the defendant officers in their official capacity, and a different limitations period would govern the same battery claim as asserted against the defendant officers in their individual capacity. If there is a good reason to adopt such an approach, plaintiff has not offered it. And, we see good reason not to do so. Plaintiff's approach would be inconsistent with the special protection that the legislature gave to local governmental entities – and to their employees – by enacting a one-year limitations period, and would frustrate the statutory goals of promoting early investigation of claims against public employees.

26

Accordingly, we apply the one-year statute of limitations in the TIA to all of Mr. Crockett's battery claims in Count IV. Since the undisputed facts show that Mr. Crockett did not bring those claims within the one-year statute of limitations period, the defendants' motion for summary judgment on Count IV is granted.

## CONCLUSION

For the reasons given, the defendants' motion for summary judgment (doc. # 27) is granted in part and denied in part. The motion is granted as to all defendants on Counts I, III and IV of the complaint, and as to the City of Northlake and Officer Lopez on Count II. The motion is denied as to the excessive force claim alleged in Count III against Officer Filskov in his official capacity, which is the only claim that presents genuine issues of material fact that create an issue for trial.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: September 30, 2002**